JAMES LEWIS,

                    Plaintiff,

v.                                              Case No. 23-cv-431-pp

JACQUELIN GUTHRIE
and JOYCE WHITE,

                    Defendants.

# ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 25) AND DISMISSING CASE

Plaintiff James Lewis, who is incarcerated at Kettle Moraine Correctional Institution and is representing himself, filed this case alleging that defendants Jacquelin Guthrie and Joyce White violated his constitutional rights. The court screened the complaint and allowed the plaintiff to proceed on an Eighth Amendment claim based on the defendants' alleged failure to provide a mat for the wet, slippery floor in the bakery dish area, which resulted in the plaintiff falling and injuring himself. Dkt. No. 11 at 7. The defendants have filed a motion for summary judgment. Dkt. No. 20. The court will grant the defendants' motion and dismiss the case.

**I.    Facts[1]**

The plaintiff was incarcerated at Kettle Moraine at the time of the events described in the complaint. Dkt. No. 22 at ¶1. He worked in the bakery as a

---

[1] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

1

"food service worker – 4." Id. at ¶8. During that time, defendant Jacquelin Guthrie was employed as Kettle Moraine's food service administrator and defendant Joyce White worked as the food service manager. Id. at ¶¶2, 6.

The plaintiff alleges that on April 8, 2021, he was washing a bowl that was too big to fit in the sink and, as a result, the floor was wet. Id. at ¶9. According to the plaintiff, he was lifting the bowl from the counter onto a rolling support stand when he slipped on the wet floor, which caused his foot to get caught inside the rolling support stand. Id. The plaintiff alleges that this caused him to fall and injure his back, right knee and right hip. Id. The bowl the plaintiff was trying to wash weighed forty to fifty pounds. Dkt. No. 31 at ¶2. The area was cramped due to the bun and bread machines, tray racks and work table. Id.

The parties dispute whether the plaintiff should have been washing the bowl in the bakery sink. According to the defendants, bakery workers were instructed not to wash large mixing bowls in the bakery sink; they were supposed to take them to the "cart washroom." Dkt. No. 22 at ¶10. The cart washroom was larger and had more space for workers to wash large bowls. Id. at ¶11. The defendants state that the plaintiff should not have been washing a large mixing bowl in the bakery sink. Id. at ¶12.

According to the plaintiff, Albert Satcher, an incarcerated individual who worked in the bakery from July 2019 to January 2021, trained the plaintiff to wash mixing bowls in the sink area. Dkt. No. 31 at ¶¶3-5. Satcher, who was the "5 rate" incarcerated worker, told the plaintiff that they "lift the bowls onto

2

the sink counter to wash and rinse them out, and then they were to be brought back to the mixing area." Id. at ¶5. Satcher said that that was how he was trained and "how it has always been done." Id.

The parties also dispute whether rubber mats were available to use in the bakery. According to the defendants, there were rubber mats hanging in the cart washroom for all incarcerated workers in the kitchen, including the bakery area, to use. Dkt. No. 22 at ¶15. When staff started their shifts, they were able to take the mats to use. Id. at ¶16. At any point during their shift, staff could grab a rubber mat to place down at their workstation. Id. At the end of the day, the rubber mats were hosed down and hung back up in the cart washroom to dry so they could be used the next day. Id. at ¶17. Defendant White was never instructed by any supervisor, including Guthrie, that bakery workers could not use the rubber mats. Id. at ¶25. Guthrie and White never told any incarcerated kitchen workers that rubber mats were not for the bakery, nor was there any rule, policy or other restriction that prohibited bakery workers from using the rubber kitchen mats. Id. at ¶26. After the plaintiff fell, White placed the rubber mats that already were available on the bakery floor, and again reminded staff that the mats were for everyone to use and should be placed on the floor before the beginning of the workday. Id. at ¶27.

According to the plaintiff, he asked "Inmate Supervisor Santiago" if they could use the rubber mats in the bakery and was told the mats were for the

main kitchen. Dkt. No. 32 at ¶15. The plaintiff states that the defendants told him that they would look into getting rubber mats for the bakery. Id.

Guthrie and White did not see the plaintiff fall on April 8, 2021. Dkt. No. 22 at ¶18. Santiago reported the plaintiff's fall to security. Id. On April 12, 2021—four days after his fall—the plaintiff sent an interview request to Guthrie about slippery floors in the sink area of the bakery, stating:

> There is no rubber mat in the sink area in the bakery like they have in the main kitchen to guard against slippery floors in our work area thereby causing an unsafe working condition. We should also not have to wash the mixing bowls in the bakery. They should be taken to the dishroom where they can be properly washed and sanitized.

Id. at ¶19. Guthrie responded to the plaintiff's request the next day, stating:

> The rubber mats hang on the cart wash room wall. I encourage anyone who works in F.S. [foodservice] to use a mat if they feel unsafe. The Hobart bowls don't have to be washed in the bakery sink. These should go to the cart wash to be done by bakery workers. I've told many F.S. workers, 'If you use it, you wash it.'

Id. at ¶20.

The parties dispute whether, before he fell, the plaintiff told the defendants about the wet floor in the bakery area. According to the defendants, the plaintiff did not inform Guthrie or White prior to his April 8, 2021 fall that the bakery sink area was slippery or that the floor was wet because he was washing large mixing bowls in the bakery sink. Dkt. No. 22 at ¶¶21-22. If the defendants noticed a wet floor while they were in the kitchen, it was their standard practice to notify kitchen staff about the wet floor and then have them clean that area. Id. at ¶23. They would also encourage kitchen staff to use a rubber mat. Id. Before this incident, Guthrie and White were not aware of

4

any complaints about dangerous conditions or slippery floors. Id. at ¶28. The only "ICRS complaint" filed regarding the bakery at Kettle Moraine was the plaintiff's April 19, 2021 complaint, KMCI-2021-6157. Id. at ¶29.

According to the plaintiff, he approached the defendants "on different occasions" and asked if the bakery could have rubber mats like those used in the main kitchen because the floor would get wet while washing the giant bowls in the sink. Dkt. No. 32 at ¶21. The plaintiff states that when Guthrie or White saw incarcerated individuals washing the bowls in the sink—which always resulted in the floor getting wet—they never expressed any concern. Id. at ¶23. When the plaintiff fell, an incarcerated individual named Santiago had been moved to "5 rate," and the plaintiff to "4 rate," because Satcher was in segregation. Dkt. No. 31 at ¶7. The plaintiff states that if any bakery worker had a problem, he was to inform the 5 rate (or 4 rate if the 5 rate was off), who would then address the problem with Guthrie and White. Id. Satcher told Guthrie about the need for rubber mats, or something slip resistant, in the sink area. Id. Satcher was told that they were working on getting mats for the bakery. Id. Several times incarcerated individuals, including Satcher, have slipped or fallen because there was no slip resistance around the sink area. Id. Satcher observed one incarcerated individual injure his back lifting a bowl; another fell, tore a hole in the wall with the bowl and burst a pipe. Id. Guthrie was informed and no protective actions were taken. Id.

Nurse Anne Reilly evaluated the plaintiff in the bakery after his April 8, 2021 fall. Dkt. No. 22 at ¶32. When Reilly evaluated the plaintiff in the bakery

he was grimacing and complaining of pain but had full sensation in all extremities and denied any numbness or tingling. Id. at ¶33. There were no redness or open areas noted to the plaintiff's right knee. Id. at ¶35. There was no bulging noted to his right hip. Id. Reilly did not observe any obvious deformity to the right leg or hip. Id. The plaintiff was able to move his knee but was resistive due to his reports of pain. Id. at ¶36. He was moved to a wheelchair with help and brought to the health services unit (HSU) for further evaluation. Id. Reilly gave the plaintiff 800mg Ibuprofen, an ice bag, two pillows and an ACE wrap and ordered a knee brace. Id. at ¶37. The plaintiff also was given a restriction for no work and no recreation for two weeks. Id.

APNP Thompson saw the plaintiff in the HSU on April 8, 2021, after his assessment in the bakery by Reilly. Id. at ¶38. Thompson examined the plaintiff's right knee and noted that he had no significant swelling and no gross deformity when compared with his left knee. Id. at ¶41. She did not note any redness or bruising. Id. The plaintiff's right knee was tender to lateral patellar spaces (the area at the edge of the kneecap) both inferior and superior. Id. at ¶42. The plaintiff allowed Thompson to do gentle range-of-motion extension and flexion of his right knee, which was intact without any crepitus (popping, clicking or crackling in the joint) or increased elevation of his pain. Id. at ¶43. No varus-valgus laxity was noted in the right knee, which checks the laxity of ligaments. Id. at ¶44.

The plaintiff was given ice, Ibuprofen and Tylenol while in the HSU. Id. at ¶46. Thompson placed orders for x-rays of the plaintiff's hip and knee and kept

6

him in the HSU until x-rays arrived to definitively rule out any acute injury such as a fracture. Id. Reilly applied an ace wrap and taught the plaintiff how to walk with crutches. Id. Thompson advised the plaintiff that if he had any injury at all, it would be a knee sprain versus an internal derangement. Id. at ¶47. Knee sprains are a common injury; they happen when ligaments stretch too far. Id. An internal derangement is a mechanical disorder of the knee that interferes with normal joint motion and/or mobility, such as a fragment of soft tissue or bone that suddenly becomes interposed between the articular surfaces. Id. With either injury the standard of care begins with conservative treatment for two weeks. Id. at ¶48. Thompson advised the plaintiff that he should not work for two weeks and should use only non-weightbearing to light-touch crutch walking for the next two weeks. Id. She ordered a follow-up in about two weeks. Id.

On this same date—April 8, 2021—the plaintiff's x-rays were completed. Id. at ¶49. Thompson sent the plaintiff a letter regarding his x-ray results, which showed only mild arthritis in his right knee and right hip. Id. She explained that these were chronic changes and were not associated with his fall. Id. She advised him to continue the plan of care as discussed. Id.

On April 9, 2021, the plaintiff was seen by Nurse Schwaller in the HSU for a follow-up visit. Id. at ¶51. The plaintiff continued to report pain in his hip and right knee. Id. Schwaller did not note any redness, bruising or swelling. Id. at ¶52. The plaintiff's vital signs all were normal. Id. Schwaller explained to the plaintiff that his x-rays did not show any acute injury and advised him to

7

continue with protect, rest, ice, compression and elevate (PRICE) recommendations. Id. at ¶53. As a comfort measure, Schwaller placed an order for wheelchair rides as needed to facilitate the plaintiff's mobility needs throughout the facility. Id. at ¶54.

On April 16, 2021, Schwaller saw the plaintiff in the HSU for a follow-up visit. Id. at ¶57. The plaintiff reported that his right knee was painful with weightbearing because the week prior he had slipped in the bathroom while showering and re-twisted his knee. Id. Schwaller noted that the plaintiff now had a shower chair to use to prevent any fall, but that he was concerned that there were no grab bars or slip strips in the bathroom. Id. at ¶58. Upon examination, Schwaller noted that the plaintiff's right knee had minimal swelling and full range of motion. Id. at ¶59. The plaintiff was using a shower chair, crutches, ACE wrap and oral analgesic medications to manage his pain. Id.

Thompson saw the plaintiff on May 10, 2021 for a follow-up visit. Id. at ¶62. The plaintiff began the visit with inquiries about lactase, long underwear and a back brace, all of which were pre-existing conditions unrelated to his fall. Id. She asked a nurse to come in so they could address his knee pain, which was the purpose of the visit. Id. The plaintiff repeatedly threatened to sue Thompson. Id. During this visit, Thompson went over the plaintiff's x-ray findings and again explained that they showed mild arthritis to his knee (tricompartmental) and right hip. Id. at ¶63. She explained that these were chronic changes and were not associated with his fall. Id. The plaintiff reported

8

that he still was using his crutches and wheelchair rides. Id. at ¶64. Thompson's objective musculoskeletal assessment was that the plaintiff's gait and station were normal, he had full range of motion to all extremities and he got on to the exam table without difficulty. Id. at ¶65. He was weightbearing as she watched him walk with the crutches, although he was reluctant to give them up. Id. For the first time at this visit, the plaintiff also reported some discomfort with his left knee. Id. at ¶66. Thompson conducted a bilateral knee exam, noting that the plaintiff's right knee exam was "fairly unremarkable." Id. Upon examination of the left knee, she noted that the left knee had more significant positive findings than the right knee. Id. She ordered an x-ray of the left knee. Id. Thompson agreed to allow the plaintiff to continue with crutches and wheelchair rides until he could be seen and evaluated by physical therapy. Id. at ¶67.

On May 13, 2021, the x-ray of the plaintiff's left knee was complete. Id. at ¶70. The x-ray showed degenerative joint disease with demineralization (arthritis) in all three compartments of the left knee. Id.

On May 19, 2021, PT Ramirez responded to an HSR from the plaintiff in which he inquired about starting physical therapy. Id. at ¶72. Ramirez responded that the plaintiff was on the waiting list and would be seen soon. Id. The plaintiff had physical therapy sessions to improve his chronic arthritis symptoms on the following dates: May 27, June 4, June 11, June 22, July 1

9

and July 8, 2021.² Id. at ¶73. The plaintiff turned in his crutches for a cane on June 4, 2021. Id. at ¶74.

On July 1, 2021, Nurse Gliniecki noted that a correctional officer had called HSU, questioning the plaintiff's need for wheelchair rides because he was on the list to play softball. Id. at ¶75. Gliniecki instructed the officer to inform the HSU whether the plaintiff was playing or just observing. Id. The physical therapist also was informed and stated that if the plaintiff was playing softball, then the wheelchair rides restriction would be removed. Id. On that same day—July 1, 2021—Health Services Manager Julie Ludwig received a call from the recreation leader that the plaintiff received a wheelchair ride down to the softball field. Id. at ¶76. He walked with a cane from the cart up the hill and out to the middle of the field. Id. Once he was out in the field, he placed the cane down and played the entire time without utilizing the cane.³ Id. On this same date—July 1, 2021—the plaintiff turned in his cane to Ramirez because he reported not needing it for a few weeks. Id. at ¶77.

The plaintiff was discharged from physical therapy on July 8, 2021. Id. at ¶78. He reported no pain in his knee. Id. He had met all his long-term physical

---

² The plaintiff disputes that his symptoms were from chronic arthritis and not from his fall in the kitchen. Dkt. No. 32 at ¶73. He says that prior to his fall he had had no problem with pain in his knees, his gait or his balance. Id.

³ The plaintiff disputes this, asserting that he played first base where he stood a foot from the bag, not in the middle of the field. Dkt. No. 32 at ¶26. He says that all he had to do was catch a ball and touch a base. Id.

10

Case 2:23-cv-00431-PP   Filed 02/12/25   Page 10 of 19   Document 35

therapy goals. Id. He was educated on continuing stretching and icing as needed for pain and inflammation with modifying activities as needed. Id.

Thompson saw the plaintiff next on December 16, 2021. Id. at ¶81. Upon examination, she noted that the plaintiff's gait and station were normal, that he had full range of motion to all his extremities and that he got on the exam table without difficulty. Id. The plaintiff reported increased discomfort in both knees and was taking ibuprofen. Id. at ¶82. He agreed to try a different NSAID (Non-Steroidal Anti-Inflammatory Drug), such as Celebrex, to see whether that was more effective. Id.

It is Thompson's opinion to a reasonable degree of medical certainty that the plaintiff was not seriously injured when he fell on April 8, 2021. Id. at ¶83. When she initially examined the plaintiff's right knee and hip on April 8, 2021, there were no signs of any obvious injury or trauma, such as swelling, redness or bruising. Id. His bilateral knee exams were unremarkable, except for arthritis. Id. The plaintiff's x-rays were negative for an acute injury but did reveal chronic degenerative arthritis that likely is the source of his reported pain and disability.[4] Id.

The plaintiff graduated as a licensed practical nurse in September 1990 and worked in the field for two decades. Dkt. No. 33 at ¶13. He states it is his

---

[4] The plaintiff disputes this, stating that upon examination, Thompson *did* see swelling to the plaintiff's right knee, although she claimed that the swelling was not significant. Dkt. No. 32 at ¶83. He asserts that arthritis had nothing to do with his pain and disability. The plaintiff reiterates that prior to his fall he had no problems with his knees, gait or balance. He says that the need to restrengthen his knees came after his prolonged use of crutches and a cane. Id.

opinion that mild arthritis was not the source of his "pain and disability." Dkt. No. 31 at ¶52. He says that otherwise, he already would have been experiencing the pain in his knees and the problems with his gait and balance. Id. He believes that the cause of his pain and disability was his fall in the bakery in which he suffered acute pain in his right knee. Id. at ¶53. The plaintiff states that the pain occurred when he fell, that it was sharp, that required short-term medical care and that it was due to a traumatic or physical injury. Id.

**II. Analysis**

    A.    <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

12

Case 2:23-cv-00431-PP    Filed 02/12/25    Page 12 of 19    Document 35

opinion that mild arthritis was not the source of his "pain and disability." Dkt. No. 31 at ¶52. He says that otherwise, he already would have been experiencing the pain in his knees and the problems with his gait and balance. Id. He believes that the cause of his pain and disability was his fall in the bakery in which he suffered acute pain in his right knee. Id. at ¶53. The plaintiff states that the pain occurred when he fell, that it was sharp, that required short-term medical care and that it was due to a traumatic or physical injury. Id.

**II.   Analysis**

    A.    <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. Discussion

The defendants contend that they were not deliberately indifferent to a serious risk of harm to the plaintiff. Dkt. No. 21 at 9-10. According to the defendants, the conditions at the bakery did not present a substantial risk of harm, nor did they ignore a substantial risk of harm. Id. at 11-16. The defendants also assert that the plaintiff did not suffer an actionable injury when he fell. Id. at 16-19. Finally, they claim that they are entitled to qualified immunity. Id. at 19-20.

The plaintiff responds that the defendants were deliberately indifferent to a serious risk of harm. Dkt. No. 30 at 11-14. He states that the conditions in the bakery constituted a serious risk of harm, that the defendants knew about the risk and that they did not do anything to address it. Id. The plaintiff contends that he suffered an actionable injury. Id. at 15-16. He also contends that the defendants are not entitled to qualified immunity. Id. at 16-17. The defendants did not file a reply brief.

13

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to "provide humane conditions of confinement, . . . ensure that inmates receive adequate food, clothing, shelter, and medical care, and . . . 'take reasonable measures to guarantee the safety of inmates.'" Balle v. Kennedy, 73 F.4th 545, 552 (7th Cir. 2023) (quoting Farmer v. Brennan, 511 U.S. 825, 832-33 (1994)). "[P]rison conditions violate the Eighth Amendment if they pose a substantial risk of serious harm and prison officials are deliberately indifferent to the risk." Anderson v. Morrison, 835 F.3d 681, 682 (7th Cir. 2016) (citing Farmer, 511 U.S. at 837).

The deliberate indifference standard contains "an objective and subjective component." Balle, 73 F.4th at 552 (quoting Thomas v. Blackard, 2 F.4th 716, 719 (7th Cir. 2021)); see also Daugherty v. Page, 906 F.3d 606, 611 (7th Cir. 2018). Under the objective component, the challenged prison conditions must have been so serious that they "creat[ed] an excessive risk to the inmate's health and safety." Balle, 73 F.4th at 552 (quoting Thomas, 2 F.4th at 719–20). Under the subjective component, the official must also have been "subjectively aware of" the conditions and "intentionally disregarded" them. Id. (quoting Johnson v. Prentice, 29 F.4th 895, 904 (7th Cir. 2022)).

Slippery surfaces at prisons generally do not constitute an Eighth Amendment violation because they are a common public risk, and the possibility of slipping does not constitute a substantial risk of harm. See Pyles v. Fahim, 771 F.3d 403, 410 (7th Cir. 2014) (holding that "slippery surfaces and shower floors in prison, without more, cannot constitute a hazardous

condition of confinement" that violates the Eighth Amendment). On the other hand, while "prisons are not required to provide a 'maximally safe environment,' they must address easily preventable, observed hazards that pose a significant risk of severe harm to inmates." Anderson, 835 F.3d at 683 (internal citations omitted) (allegation that incarcerated individual fell while being forced to walk, while handcuffed, down stairs covered in milk and garbage that the defendants intentionally ignored satisfied the objective element at the screening stage).

In Balle, a kitchen supervisor directed an incarcerated individual to carry "near-boiling water across a wet, damaged floor in a plastic five-gallon bucket." 73 F.4th at 548. The incarcerated person's foot caught in a hole, he fell and the water splashed on him, causing severe burns. Id. The court determined that while the poor condition of the floor alone was not enough to support an Eighth Amendment claim, carrying near-boiling water over that floor might be. Id. at 554.

> A wet, uneven kitchen floor is not meaningfully more dangerous than the surfaces in the mine run of slip-and-fall cases, but carrying scalding water in a bucket over that floor increases the danger significantly. Crediting Balle's testimony, a reasonable jury could find that the kitchen floor was like an "obstacle course" and that having his hands full with a bucket prevented Balle from seeing the floor beneath him or "steadying himself to avoid tripping." *See id.* Further, falling under these conditions would be more dangerous than slipping in the shower—Balle was carrying gallons of scalding water that could spill on him if he tripped. *See id.* These conditions are objectively dangerous enough to raise an issue of fact and give rise to a potential Eighth Amendment claim.

Id. at 554-55.

15

Case 2:23-cv-00431-PP   Filed 02/12/25   Page 15 of 19   Document 35

In this case, the plaintiff lifted a large bowl that weighed forty to fifty pounds from the bakery sink to a cart. The floor was slippery because water had splashed onto it when the plaintiff washed the bowl. The parties dispute whether the plaintiff should have been washing the bowl in the bakery sink in the first place. According to the plaintiff, he had been trained to wash the bowl in the bakery sink. The defendants state that the bowls were supposed to be washed in the cart washroom. It is undisputed that floor mats were hung up in the kitchen for workers to use but the parties dispute whether mats were available for use in the bakery. The plaintiff states that before the incident, Guthrie said mats could not be used in the bakery.

The plaintiff contends that his situation is analogous to the plaintiff in Balle because it involves more than a wet, slippery floor; he asserts that it involves moving a heavy bowl from the sink to a cart on a wet, slippery floor. He also points out that the area was crowded so he did not have much room to move around. The plaintiff asserts that he previously had asked for a floor mat and was told that they were working on it. He also states that incarcerated individuals previously had slipped and fallen while washing large bowls in the bakery.

Contrary to the plaintiff's contention, the plaintiff's circumstances are distinguishable from those in Anderson and Balle. In Anderson, the incarcerated person who fell was handcuffed and made to walk down stairs that were wet and strewn with garbage. He had no ability to hang onto anything while he walked. In Balle, the incarcerated individual who fell had

16

been directed to carry a five-gallon bucket filled with boiling water over a wet floor that contained holes. Because he held the bucket with both hands, the individual could not see the holes in the floor beneath him nor could he steady himself to avoid tripping when his foot got caught in a hole.

A wet, slippery floor, by itself, is not objectively serious under the Eighth Amendment. Balle, 73 F.4th at 554. Additional conditions must exist to increase the danger such that it amounts to a hazardous condition of confinement under the Eighth Amendment. In this case, those additional conditions consisted of lifting a forty- to fifty-pound bowl from the sink to a cart in a crowded area. The plaintiff was not handcuffed and made to walk down a set of wet stairs strewn with garbage, like the plaintiff in Anderson. Nor did the plaintiff have to walk over a slippery floor with holes in it that he could not see because he was carrying a bucket of boiling water, like the plaintiff in Balle. The plaintiff lifted a heavy bowl from the sink to a cart while standing on a floor that he knew was wet. These conditions are not objectively serious under the Eighth Amendment. Cf. Anderson, 835 F.3d at 683 (incarcerated individual could not manage the danger he faced when handcuffed and ordered to walk on garbage-strewn stairs).

Because the plaintiff has not satisfied the objective prong of an Eighth Amendment claim,[5] a reasonable jury could not find that the defendants

---

[5] The defendants provided extensive evidence about the treatment the plaintiff received after his fall. If the question were whether the defendants were deliberately indifferent in providing insufficient medical care, the answer would be that they were not. But the plaintiff's allegation is that the defendants were

17

violated his constitutional rights. See Pyles, 771 F.3d at 410-11. The court will grant the defendants' motion for summary judgment and dismiss the case.[6]

### III. Conclusion

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 20.

The court **ORDERS** that this case is **DISMISSED**. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. Rule of App. P. 4(a)(5)(A).). If the plaintiff appeals, he will be liable for the $605 appellate filing fee regardless of the outcome of the appeal. If the plaintiff seeks to proceed on appeal without prepaying the appellate filing fee, he must file a motion *in this court*. See Fed. R. App. P. 24(a)(1). The plaintiff may be assessed a "strike" by the Court of Appeals if it concludes that his appeal has no merit. If the plaintiff accumulates three strikes, he will not be able to file a case in

---

deliberately indifferent to the risk of injury posed by the wet floor under the circumstances the plaintiff alleged.

[6] Based on the court's determination that the plaintiff has not established a constitutional violation, the court will not address the defendants' contention that they are entitled to summary judgment because the plaintiff did not suffer an injury or the defendants' qualified immunity argument.

federal court (except a petition for *habeas corpus* relief) without prepaying the full filing fee unless he demonstrates that he is in imminent danger of serious physical injury. Id.

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Rule 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2). Any motion under Rule 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Fed. R. Civ. P. 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 12th day of February, 2025.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**